## CONTINUATION OF SEARCH WARRANT APPLICATION

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) of the FBI, and have been so employed since June 2003. Before joining the FBI, I served as a police officer in Pennsylvania for approximately five years. I am currently assigned to the Kalamazoo office of the FBI's Detroit Division. I have had training in the preparation, presentation, and service of criminal complaints and arrest and search warrants, and have been involved in the investigation of offenses against the United States to include threatening communications and crimes of terrorism. My primary duty involves intelligence and criminal investigation of terrorism matters. My knowledge of the facts and circumstances contained within this affidavit is based upon my personal investigation, as well as reports made to me by other law enforcement agents.

2.      This continuation sheet is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of those violations is located within the email account: mosaalmahdi@gmail.com. The facts set forth herein are based upon my personal knowledge as well as information provided by other officers, law enforcement agencies, and private investigators.

### IDENTIFICATION OF THE LOCATION TO BE SEARCHED

3.      I submit this continuation sheet in support of an application for a search warrant for information associated with a certain account that is stored at premises

1

controlled by Google, Inc., an email provider headquartered at Custodian of Records, Google, 1600 Amphitheatre Parkway, Mountain View, CA 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google Inc. to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## JURISDICTION

4.   This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## SUMMARY OF INVESTIGATION

5.   On 3/18/2015, at approximately 12:20 a.m., Kalamazoo Department of Public Safety ("KDPS") Officers responded to a complaint at Wild Bull Saloon on S. Edward Street in Kalamazoo, Kalamazoo County, Michigan, concerning a patron, later identified as being MOSA JAMAL ALMAHDI, date of birth (DOB X/XX/1991), who threatened two security guards with a handgun. KDPS had already been dispatched to the scene based on ALMAHDI's aggressive behavior toward a female patron inside Wild Bull Saloon. After taking a complaint from the victims of the assault, KDPS Officers

effected a traffic stop of ALMAHDI in the parking lot at Wild Bull Saloon. ALHMAHDI was removed from the vehicle, a white Dodge Charger, and placed in handcuffs. A search of the vehicle resulted in the recovery of a loaded black Bersa Thunder .380, Serial Number E03247, which was registered to ALMAHDI.

6. On 3/18/2015, ALMAHDI was subsequently arrested by the responding KDPS Officers at Wild Bull, and ALMAHDI was charged by the Kalamazoo County Prosecutor's Office with six state law violations arising from this incident.

7. On 6/22/2015, based on entering a guilty plea to the instant offense, ALMAHDI was sentenced in Kalamazoo County Circuit Court in the State of Michigan to the following state law violations: Count 1 – Carrying a Concealed Weapon, a felony, in violation of MCL 750.227; Count 2 – Assault with Dangerous Weapon, a felony, in violation of MCL 750.82; and Count 4 – Assault with a Dangerous Weapon, a felony, in violation of MCL 750.82, and the remaining Counts in the Complaint were dismissed. Each count of conviction carried a maximum sentence of 1 year and six months of jail, which was suspended, and ALMAHDI was placed on probation, with credit of 1 day of jail for time served. At the Sentence Hearing, ALHMADI was told by the Circuit Court Judge that he was now prohibited from owning and possessing firearms and ammunition.

8. On or about 6/23/2015 and continuing to 6/25/2015, in a series of telephone, text, and email communications, ALMAHDI initiated contact to an FBI Confidential Source concerning trading three semiautomatic handguns purportedly to be owned by ALMAHDI - a silver Remington 1911 with a wood grip, a black Citadel, model not verified, with a wood grip, and a black Berretta, model not verified, in

exchange for an AK-47 owned by the FBI Confidential Source. The meeting between ALMAHDI and the FBI Confidential Source to trade the firearms was to take place in Kalamazoo County, Michigan, on 6/25/2015.

9. ALMAHDI was in communication with the FBI Confidential Source via an IPhone cellular telephone, number (269) 267-3682.

10. Specifically, on 6/23/2015, at 10:51:36 p.m. Eastern Daylight Time, ALMAHDI emailed the FBI Confidential Source using the email address of [mosaalmahdi@gmail.com](mosaalmahdi@gmail.com). The Subject was labeled as "Possible Trade." In the body of the email, ALMAHDI posted the following, "I actually have pictures of them on my phone," and photographs of the above-referenced three semiautomatic weapons were embodied in the email.

11. Per Michigan Department of Motor Vehicles records, driver's license number A 453 609 366 744, was issued to MOSA JAMAL ALMAHDI on 12/14/2014. ALMAHDI's address was reflected as being 4376 Hemmingway Drive, Kalamazoo, Michigan.  ALMAHDI was a male, height 6'0" tall, with brown eyes.

12. On 6/25/2015, at approximately 7:00 a.m., surveillance was initiated by the FBI at the residence of 4376 Hemmingway Drive, Kalamazoo, Michigan.  That morning, a male matching the physical description of ALMAHDI was observed getting into a white Jeep Grand Cherokee and driving to the State of Michigan Department of Corrections Probation and Parole (Michigan DOC) Office in Kalamazoo, Michigan.

13. Per a representative of the Michigan DOC, on 6/25/2015, at approximately 10:00 a.m., ALMAHDI met with his Probation Officer for his first post-

sentence/orientation meeting. In that meeting, a Michigan DOC Probation Officer presented paperwork to ALMAHDI informing ALMAHDI that he was prohibited from owning and possessing firearms and ammunition and ALMAHDI would be charged for a crime of being a felon in possession of a firearm if he was caught possessing or owning firearms or ammunition. ALMAHDI signed the documentation in the presence of the Michigan DOC Probation Officer to that effect. Additionally, the Michigan DOC Probation Officer verbally warned ALMAHDI that he was prohibited from owning and possessing firearms and ammunition. In addition to the various warnings to ALMAHDI received at this meeting, ALMAHDI had previously been warned to dispose of and/or transfer all of his firearms and ammunition by ALMAHDI's Michigan DOC Presentence Officer prior to ALMAHDI's Sentence Hearing.

14. On 6/25/ 2015, at approximately 2:05pm, ALMAHDI was seen carrying out of his 4376 Hemmingway Drive, Kalamazoo residence two dark colored cases similar to those used to transport handguns.

15. On 6/25/2015, at approximately 2:30pm, Kalamazoo DPS Officers effected a traffic stop of a 2015 white Jeep Grand Cherokee. ALHMADI was a passenger in the vehicle driven by his girlfriend. Law enforcement officials stopped the vehicle on the belief that ALHMADI was en route to meet the FBI Confidential Source for the purpose of trading the firearms. ALMAHDI was subsequently placed in handcuffs and a search of ALMAHDI's vehicle resulted in the discovery of a silver Remington 1911 .45 caliber pistol with a wood grip, and a black Berretta, Model 92FS, 9mm pistol.

16. In a post-arrest Mirandized interview conducted on June 25, 2015,

ALMAHDI admitted that he brought the two firearms with him and was planning on trading those two firearms for an AK-47. ALMAHDI stated that his plan was to give that AK-47 to his brother for protection. ALMAHDI further advised that he loves firearms for purposes of enjoyment and protection. At one point in time, ALMAHDI stated that he owned approximately ten firearms.

17. ALMAHDI further stated that the black Citadel pistol whose photograph previously had been sent by text and email communication between 6/23/2015 and 6/25/2015 was sold on 6/24/2015.

18. Continuing the post-arrest Mirandized interview on 6/26/2015, ALMAHDI also admitted to owning four additional firearms, and that the four firearms were kept at a condominium he owns in downtown Kalamazoo. ALMAHDI stated that the four firearms at that address included an AK-47, two Savage Arms, model 320, 12 gauge shotguns, and one .357 caliber black Ruger revolver. When asked why ALMAHDI didn't just give the AK-47 he already owns to his brother, rather than obtaining a new AK-47, ALMAHDI advised that the AK-47 he already owned was his first AK-47 and was his baby.

19. Through a subsequent consensual search of this residence, FBI Agents recovered four firearms, including two Stevens Savage Arms Model 320 12 gauge shotguns, one Ruger GP100 .357 Magnum revolver, and One CAI AK-47 rifle. Agents also seized a variety of ammunition amounting to over 100 shot gun shells, 98 rounds of rifle ammunition including 78 rounds in loaded magazines for the AK-47, and approximately 144 rounds of handgun ammunition.

## SUMMARY OF THE BASIS FOR PROBABLE CAUSE FOR THE SEARCH OF THE "mosaalmahdi@gmail.com" EMAIL ACCOUNT

20.     With a prior felony conviction, ALMAHDI may not lawfully possess firearms.  ALMAHDI utilized the mosaalmahdi@gmail.com account on 6/23/2015 in a series of email communications to initiate contact with an FBI Confidential Source concerning trading three semiautomatic handguns purportedly to be owned by ALMAHDI – a silver Remington 1911 with a wood grip, a black Citadel 1911 short barrel 9mm, and a black Beretta 92FS, in exchange for an AK-47 owned by the FBI confidential source.  The meeting between ALMAHDI and the FBI confidential source to trade the firearms was to take place in Kalamazoo County, Michigan, on 06/25/2015.

21.     Specifically, on 06/23/2015, at 10:51:36 p.m. Eastern Daylight Time, ALMAHDI emailed the FBI confidential source utilizing the email address mosaalmahdi@gmail.com.  The subject was labeled as "Possible trade".  In the body of the email to the FBI confidential source, ALMAHDI attached four large photos of the above described handguns and stated that he also had these photos on his phone.  Additionally, on 06/23/2015, at 10:54 p.m. Eastern Daylight Time, ALMAHDI again emailed the FBI confidential source utilizing the email address mosaalmahdi@gmail.com regarding the pending trade and advised, "That sounds pretty good.  I just sent you some pictures.  Also both guns have never been fired.  I bought them and just never got around to shooting them, I prefer rifles."  ALMAHDI and the FBI confidential source then went on to schedule the above mentioned meeting.

22.     Angelica V. Pointer, the driver of the vehicle at the time it was pulled over,

was shown by SA Chris Hess the email address mosaalmahdi@gmail.com to which Pointer appeared to recognize the email address and acknowledged that it probably belonged to ALMAHDI. This was the same email address that was in contact with the FBI confidential source, regarding the proposed firearms transaction described above. This email account will likely contain evidence of a crime, fruits of a crime, other items illegally possessed, and/or property used or intended for use in committing a crime.

## BACKGROUND CONCERNING EMAIL

23.   In general, an email that is sent to a Google Inc. subscriber is stored in the subscriber's "mail box" on Google Inc.'s servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google Inc.'s servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google Inc.'s servers for a certain period of time.

24.   In my training and experience, I have learned that Google Inc. provides a variety of on-line services, including electronic mail ("email") access, to the public. Google Inc. allows subscribers to obtain email accounts at the domain name (www.gmail.com), like the email account listed in Attachment A. Subscribers obtain an account by registering with Google Inc. During the registration process, Google Inc. asks subscribers to provide basic personal information. Therefore, the computers of Google Inc. are likely to contain stored electronic communications (including retrieved and unretrieved email for Google Inc. subscribers) and information concerning subscribers and their use of Google Inc. services, such as account access information, email transaction information, and account application information. In my training and

experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

25. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

26. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address

9

information can help to identify which computers or other devices were used to access the email account.

27. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

28. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from

which users access the email account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

29.    Based on the forgoing, I respectfully request that the Court issue the proposed search warrant. Because the warrant will be served on Google Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.